**O**

1

2

3

4

5

6

7

8

9

10          UNITED STATES DISTRICT COURT

11          CENTRAL DISTRICT OF CALIFORNIA

12

13  DONALD AUSTEN,                          )   Case No.  15-07372 DDP (FFMx)
                                            )
14                  Plaintiff,              )
                                            )   **ORDER RE: DEFENDANTS'**
15                                          )   **MOTIONS FOR SUMMARY**
        v.                                  )   **JUDGMENT**
16                                          )
                                            )
17  COUNTY OF LOS ANGELES, LOS              )   [Dkt. Nos. 142, 148, 149]
    ANGELES COUNTY DEPARTMENT OF            )
18  PUBLIC SOCIAL SERVICE, JESSICA          )
    CRUZ, CITY OF LOS ANGELES, LOS          )
19  ANGELES POLICE DEPARTMENT,              )
    SANDRA HOLGUIN, ALFREDO                 )
20  MORALES, DEANCO HEALTHCARE,             )
    LLC,                                    )
21                                          )
                                            )
22                  Defendants.             )
                                            )
23

24          Presently before the court are Defendants' Motions for Summary Judgment. (Dkt.

25  Nos. 142, 148, 149.) Having considered the parties' submissions and heard oral argument,

26  the court adopts the following Order.

27

28

## I. BACKGROUND

Plaintiff Donald Austen alleges that Defendants infringed upon his constitutional rights and committed violations of state law, all arising out of an incident that resulted in Austen's involuntary residence at Mission Community Hospital for a 72-hour psychiatric hold.

Defendants belong to three main groups—the County Defendants, the LAPD Defendants, and Deanco Healthcare, LLC d/b/a Mission Community Hospital ("MCH" or "the Hospital")—each of which has filed its own Motion for Summary Judgment. Collectively, the County Defendants include the County of Los Angeles and Department of Mental Health employees Jessica Cruz and Sandra Holguin.[1] The LAPD Defendants include the Los Angeles Police Department and Officer Alfredo Morales.

### A. The Phone Calls

Plaintiff Donald Austen works at Thursday's Child, a non-profit that serves at-risk children and youth. (Dkt. 148-6, Ex. 19, Track 2, 13:30.) On February 2, 2015, Austen contacted Los Angeles County to inquire about mental health grants for Thursday's Child. (Dep. Austen 44:8-31.) The next day, around 8:30am, Austen and Jessica Cruz, a psychiatric social worker in the Children's Bureau Division at the Department of Mental Health, spoke by phone. (*Id*. 45:10-14.) Cruz had been directed to return Austen's call, and provided him with a phone number to contact. (*Id*. 45:22-25.) Austen informed her that he had already tried that number, and requested that Cruz call the number herself and then "give [him] a specific name to ask for." (*Id*. 47:1-5.)

According to Austen, Cruz called back around 11:30am. (*Id*. at 47:24.) Austen reports that Cruz's first statement was "Are you suicidal?" (*Id*. at 48:6-7.) He answered "No. Why would you ask that?" (*Id*. at 48:8-10.) Cruz told Austen that he sounded suicidal to her. (*Id*. 48:9-10.) Austen then asked to speak to Cruz's supervisor. (*Id*.) Cruz

---

[1] County Defendants maintain that the County Department of Public Social Services ("DPSS") is erroneously named in this action. Because Austen sets forth no basis for its inclusion, the court dismisses DPSS as a defendant in the present action.

placed him on hold for about 20 minutes. (*Id*. at 49:7-11.) Austen eventually hung up, redialed the number, and Cruz transferred him to her supervisor, Elizabeth Fitzgerald. (*Id*. 49:23-24.) Fitzgerald gave him the name of the head of the Department of Mental Health upon request. (*Id*. 50:12-20.)

Defendants dispute both the details and the tenor of these conversations. Cruz states that Austen became extremely angry, "saying that if he didn't get funding, he was going to kill himself," and threatened that, if Cruz sent the police, he would "take them out." (Cruz Dep. 45:14-16; Cruz Decl. ¶ 5.)

Although Cruz served in an administrative capacity at the Department of Mental Health, (Cruz Decl. ¶ 2), she had previous experience as a trainer for suicide prevention. (Cruz Dep. 9:1-3.) Cruz states she became concerned after her conversation with Austen, and spoke with Fitzgerald. (Cruz Decl. ¶ 6.) Fitzgerald instructed Cruz to ask the advice of the Psychiatric Mobile Response Team (PMRT), a part of the Department of Mental Health's Emergency Outreach Bureau. (*Id*. ¶ 6.) PMRT then recommended that Cruz contact LAPD and request a welfare check on Austen. (*Id*. ¶ 8.)  LAPD transferred Cruz to a 911 operator. (*Id*. ¶ 8.)

Around 11:57am, Cruz spoke with a 911 operator to request a welfare check on Austen. (Omnibus Decl., Ex. 14b.) Cruz identified herself as an employee of the Department of Mental Health, and informed the 911 operator that Austen had made suicidal statements and threated that "if you send police, I'm gonna take them out." (*Id*.)[2]

Around 12:47pm, one hour later, Cruz made a second 911 call. (*Id*.; Decl. Morales ¶ 9; Omnibus Decl., Ex. 14b.) In this conversation, Cruz stated that Austen had called back, threatening to kill her and take her license away. (*Id*.) She reported that she had placed Austen on hold in order to place the 911 call, and that he was eventually transferred to her supervisor Elizabeth Fitzgerald. (Omnibus Decl., Ex. 14b, at 10.)

---

[2] Austen denies saying "If you call the police, I will take them out." (Austen Dep. 189:24-190:2.)

Fitzgerald offered Austen the phone number of the head of the Department of Mental Health. (*Id.*) The 911 operator eventually advised Cruz to hang up so that LAPD could reach Austen at the phone number he was using to dial Cruz.

**B. LAPD Response**

After Cruz's initial 911 call, the Los Angeles Police Department dispatched officers to check on a "male with mental illness" at the offices of Thursday's Child, which also served as Austen's home. (Decl. Morales ¶ 6.)

One of the units was a team focused on mental health responses, comprised of LAPD Officer Alfredo Morales and his partner, Sandra Holguin, a registered psychiatric nurse employed by the Department of Mental Health. (Decl. Morales ¶¶ 1, 4.) Both individuals were certified to file an application for a temporary 72-hour psychiatric hold under the Lanterman-Petris-Short Act, commonly known as a "5150 hold" after its originating statutory provision, California Welfare and Institutions Code § 5150.

Morales and Holguin reached the scene after 1:15pm, after two police units had already arrived. (Decl. Morales ¶¶ 6, 8.) The pair was informed that the officers on the scene had attempted to call Austen out of his house. (*Id.* ¶ 9.) LAPD Officer Brien had called Austen's number and requested that he step out into the front yard of the house. (Austen Dep. 52:20-22.) Brien reported that Austen was "very agitated and angry," and "continuously told us to leave, go away, and that he was fine." (Dep. Brien 33:22-24.) In a recorded call between Austen and LAPD, Austen requested that the LAPD officers be "sen[t] away." (Dkt. 148-6, Ex. 19, Track 2, 1:32.)

More than one hour after LAPD officers first arrived on the scene, Austen agreed to open the courtyard gate and let the police inside. (*Id.* 54:21-22; Dkt. 149-9, Ex. E.) LAPD officers handcuffed Austen, (Austen Dep. 55:16), and Morales and Holguin took him into custody to assess whether he should be placed on a 72-hour psychiatric hold. (Morales Decl. ¶ 12.)

**C. Interview in Police Custody**

After speaking briefly with Austen, Morales and Holguin transported Austen in handcuffs to Devonshire Police Station. (Morales Dep. ¶ 12; Holguin Dep. ¶ 5.) At the police station, Holguin conducted an assessment of Austen in the presence of Officer Morales and attempted to interview him. (Holguin Decl. ¶ 6.) Holguin reports that Austen was evasive, hostile, and verbally abusive. (*Id*.; Holguin Dep. 34:20-21.) While at the station, Holguin called Cruz to confirm the substance of the 911 calls. (Holguin Decl. ¶ 2.)

Around 4pm, Holguin completed a document entitled Application for Assessment, Evaluation, and Intervention or Placement for Evaluation and Treatment (the "Application"). (Dkt. 149-7, Ex. C.) The Application served as a request for Austen to be examined by mental health professionals at a hospital. (Decl. Morales ¶ 14.) Both Holguin and Morales signed the Application. (*Id*.)

**D. Transfer to Mission Community Hospital**

Austen was then transferred by Morales and Olguin to Mission Community Hospital, where he was held pursuant to a 72-hour psychiatric hold. Before Morales and Holguin left Austen with hospital staff, the charge nurse asked if Austen was dangerous. (Austen Dep. 69:16-23.) Austen recalls that Morales and Holguin said "No," took his handcuffs off, and left him waiting on the gurney. (*Id*. 69:21-23.)

After a battery of medical exams and screenings, Austen was sent to the Hospital's Behavioral Health Unit (BHU). (Braff Decl. ¶¶ 7, 8.) Austen was seen by BHU intake nurse Carlos Megia. (Megia Decl. ¶ 3.) Megia completed the Mission Community Hospital Assessment Report, and reviewed the Application for completeness. (*Id*. ¶¶ 4, 5.)

The following afternoon, on February 4, 2017, Plaintiff was seen by attending physician Dr. Hassan Farrag. (*Id*., Ex 6.) Dr. Farrag observed that Austen was providing him with "a totally different picture" than in the Application. (*Id*.) Farrag noted that "right now, I have two totally different stories . . .[s]o I will observe for myself." (*Id*.)

Upon Dr. Farrag's request, a hospital social worker contacted Austen's alleged daughter, who "gave the social worker sort of half answers." (*Id.*) Farrag's notes state the following:

> [W]hen the social worker asked the daughter, "are you his daughter[;]" she said, "I don't want to talk about that." When she asked the daughter if the patient has any psychiatric issue or psychiatric problem, or what is going on between them, she also answered "I don't want to talk about that." With the answer that I have on hand, I felt more uncomfortable than comfortable releasing the patient back to his home and his daughter. So, I had the social worker [in the room] and had a second session with the patient to find out what the heck is going on. At that point, the patient totally changed the story saying that it is actually not his daughter, but he adopted this lady 6 years ago . . . . (*Id.*)

Dr. Farrag directed the social worker to again contact Austen's alleged daughter and ask her additional questions; the social worker reported back to Dr. Farrag that "the daughter is not really a daughter at all, but she met the patient on the internet a year ago and they live together." (*Id.*, Ex. 7.) The social worker informed Dr. Farrag that "the patient told [the alleged daughter] to tell us good information; otherwise, people will get harmed." (*Id.*, Ex. 7.)

On February 6, 2015, Dr. Farrag released Austen after the expiration of the 72-hour hold. (*Id.*, Ex. 8.) His case notes state that "[f]rom admission, actually the representation of the patient was quite intact" and that, upon discharge, Dr. Farrag "had no criteria for a 14-day hold and actually [] did not feel that the patient can benefit from an acute psychiatric hospital [as] he is taking no psychiatric medication, and has no actual psychiatric behavior at the hospital." (Tala Decl., Ex. 9.)

On the basis of the facts set forth above, Austen brought suit against Defendants, alleging, *inter alia*, violations of his Fourth and Fourteenth Amendment Rights under 42 U.S.C. § 1983, multiple violations of WIC § 5150, false arrest and imprisonment, negligent and intentional infliction of emotional distress, and false light. (*See* Fourth Am. Compl.) Defendants now move for summary judgment.

## II. LEGAL STANDARD

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. *See Anderson v. Liberty Lobby , Inc.,* 477 U.S. 242, 242 (1986). If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 323.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).*

It is not the court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1278 (9th Cir.1996). Counsel have an obligation to lay out their support clearly. *Carmen v. San Francisco Sch. Dist.,* 237 F.3d 1026, 1031 (9th Cir. 2001). The court "need not examine the entire file for evidence establishing a genuine

issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found." *Id.*

## III. DISCUSSION

### A. Qualified Immunity

Defendants claim federal qualified immunity for Austen's Section 1983 claims, which are based on violations of the Fourth and Fourteenth Amendments. Reasonable mistakes of law, fact, or both may trigger qualified immunity. *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "'protects' all but the plainly incompetent or those who knowingly violate the law.'" *Green v. Fresno*, 751 F.3d 1039, 1051 (9th Cir. 2014) (citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011)).

The Supreme Court has established a two-prong test to determine whether qualified immunity applies. *Pearson v. Callahan*, 555 U.S. 223, 235-36 (2009). A court must deny qualified immunity when (1) the allegations, if true, amount to a constitutional violation, and (2) the constitutional violation was clearly established at the time. *Id.* In applying the second prong, a court looks to whether "the right at issue was clearly established at the time of the incident, such that a reasonable officer would have understood her conduct to be unlawful in that situation." *Green v. City and County of San Francisco*, 751 F.3d 1039, 1051-52 (9th Cir. 2014) (citation and quotations omitted). The court applies this federal qualified immunity analysis to Austen's Section 1983 claims against the County Defendants and the LAPD Defendants.[3]

However, Defendant MCH is not entitled to qualified immunity for the Section 1983 claims. It cannot be assumed "private sector defendants are entitled to immunities

---

[3] The court observes that Austen's briefing discusses *Monell* liability for the Section 1983 claims on the part of the County and LAPD Defendants. Because the court, in its prior Order (Dkt. 132), expressly stated that "Plaintiff was not granted leave to add *Monell* claims against other City and County Defendants," the court will not consider those portions of Austen's briefs that address *Monell* liability on the part of any defendant, except for MCH.

8

of the sort the law provides governmental defendants," even if these defendants act under color of law. *Richardson v. McKnight*, 521 U.S. 399, 402 (1997). In *Jensen v. Lane County*, the Ninth Circuit concluded that a private contract psychiatrist conducting medical evaluations of persons admitted on temporary psychiatric holds was not entitled to qualified immunity. 222 F.3d 570, 578 (9th Cir. 2000). The court noted that qualified immunity applies when there exists a "firmly rooted" tradition of immunity in the common law as well as "strong policy reasons" in favor of immunity. *Id*. at 576. The Ninth Circuit concluded that "doctors asked by the government to make a decision to commit persons suspected of mental illness" satisfied neither criteria. *Id*. The court finds no reason to diverge from the Ninth's Circuit's analysis here, and indeed MCH supplies none. Although MCH is a hospital and not a contract psychiatrist, the court finds no functional basis to differentiate between these two entities in deciding whether qualified immunity applies in this case.

### a. Section 1983 Claims under the Fourth Amendment

Austen contends that Defendants acted in violation of the Fourth Amendment when they took him into custody and initiated a Section 5150 hold, in the absence of probable cause that he was mentally ill and a danger to himself or others.[4]

"Although there are few decisions that discuss the fourth amendment standard in the context of seizure of the mentally ill, all have recognized the proposition that such a seizure is analogous to a criminal arrest and must therefore be supported by probable cause." *Maag v. Wessler*, 960 F.2d 773, 775 (9th Cir. 1991), *as amended on denial of reh'g*

---

[4] Austen's Fourth Amended Complaint briefly refers to "excessive force," but contains little content as to the grounds for this claim. *See* Fourth Am. Compl. ¶ 98 ("Defendants made a massive show of force, including an armed SWAT team, numerous squad cars with armed LAPD officers, and a helicopter . . . .") In light of the undisputed fact that LAPD was informed that Austen would "take out" the police, the court concludes that Austen has not created a triable issue of fact as to whether the amount of force deployed was excessive in these circumstances. Moreover, the LAPD Defendants' moving papers explicitly point out that "there are no allegations for excessive force contained" in the Complaint. (LAPD MSJ at 6.) Austen's opposition does not rebut this characterization.

(Apr. 1, 1992). Probable cause exists when, based on the totality of the circumstances known at the time, there is a "fair probability or substantial chance" that mental health reasons exist to warrant the detention. *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1018 (9th Cir. 2015).

Under Section 5150, a person may be taken into temporary emergency custody for 72 hours when that person, "as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled." Cal. Welf. & Inst. Code § 5150(a). In other words, the probable cause for a psychiatric hold must pertain to mental illness, and not a generalized probable cause of criminal activity.

Probable cause exists under this provision when the totality of the circumstances "would lead a person of ordinary care and prudence to believe, or to entertain a strong suspicion, that the person detained is mentally disordered and is a danger to himself or herself or is gravely disabled." *People v. Triplett*, 144 Cal. App. 3d 283, 287–88 (Ct. App. 1983). To establish probable cause, an individual "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant his or her belief or suspicion." *Id*. at 288. These facts may include "the past conduct, character, and reputation of the detainee." *Id*.

### i. Cruz

Austen contends that Cruz violated his constitutional rights by placing the 911 calls that resulted in his 72-hour psych hold. Cruz claims that her 911 calls were not conducted "under color of state law," a threshold requirement for claims arising under Section 1983. *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).

In *Anderson v. Warner*, the Ninth Circuit articulated three factors that influence whether a government employee acted under color of state law: (1) whether "the defendant pretended to act in the performance of [her] official duties"; (2) "with the purpose and effect of influencing the behavior of others; and (3) "used the badge of [her] authority to deprive an individual of his rights." *Id*. (quotations omitted). A person acts under color of law when she "abuses the position given to [her] by the State," even if the

scope of her authority "did not extend to the acts" committed. *Id.* at 1068. Cruz served as a psychiatric social worker in the Children's Bureau Division. (Cruz Decl. ¶ 2.) This division functions as an administrative unit within the Department of Mental Health. (*Id.*) When Cruz called 911, she stated that she was an employee of the Department of Mental Health calling for a welfare check on a potential client. (Omnibus Decl., Ex. 14b.) Under these circumstances, a reasonable jury could find that Cruz acted with the "purpose and effect" of using her status as a state employee to influence others.[5]

Austen further contends that Cruz contacted 911 with no reasonable basis to believe he presented a danger to himself or others. The parties in this case present dramatically divergent accounts of the phone conversations that precipitated the 911 calls. Cruz asserts that Austen expressed suicidal thoughts over the phone and stated that he would "take out" the police if she were to report him. (Cruz Decl. ¶ 8, Dkt. 149-2.) Austen denies making the statement "If you call the police, I will take them out." (Austen Dep. 189:24-190:2.) The court concludes there are triable issues of fact as to whether Austen made the threatening statements that Cruz reported, and whether Cruz therefore had a reasonable basis to place the 911 calls. These factual disputes preclude granting summary judgment to Cruz on Austen's Fourth Amendment claim.

### ii.    Officer Morales and Nurse Holguin

Austen asserts that Nurse Holguin and Officer Morales violated his Fourth Amendment rights when they detained him and initiated a Section 5150 psychiatric hold without probable cause.

### 1. Detention at Devonshire Police Station

---

[5] The court observes that Austen fails to address the County Defendants' argument that "The Conduct of Ms. Cruz Does Not Constitute State Action." (Dkt. 149, 24-25.) This is normally grounds for "deeming the issues conceded." *See Mossimo Holdings, LLC v. Haralambus*, No. CV 14-05912 DDP (JE), 2017 WL 1240739, at *7 (C.D. Cal. Apr. 4, 2017). Nonetheless, the court elects, in its discretion, to address the merits of Defendants' argument on this point.

As to the initial detention decision, the court concludes that Holguin and Morales had probable cause to take Austen into custody and conduct an assessment based upon the objective circumstances known to them at the time. Specifically, it is undisputed that Holguin and Morales were aware of the following facts giving rise to probable cause:

- Officer Morales heard the contents of a radio call that went out for a "male with mental illness." (Decl. Morales ¶ 5.)
- Officer Morales and Holguin were informed that the person who called 911 was Jessica Cruz, a Department of Mental Health employee. (*Id.* ¶ 8.)
- The dispatcher stated that Austen was having suicidal thoughts and he had threatened to "take them out" if Cruz reported him to the police. (*Id.* ¶ 6.)
- Cruz called 911 a second time to alert the police that Austen was threatening her life and wanted to know her location. (*Id.* ¶9.)

In addition, after they arrived at the scene, Morales and Holguin waited for approximately 45 minutes until officers persuaded Austen to leave the house. (Holguin Dep. 22:11-23:3; 23:22-24.) On the basis of these facts, the court finds that Morales and Holguin had probable cause to detain Austen to conduct further assessment as to whether to file an application for a 5150 hold.

Austen contends that Morales and Holguin had a duty to consult with the other units on the scene.[6] Specifically, he faults them for not conferring with Officer Brien who spoke with Austen on the phone for approximately 45 minutes. (Brien Dep. 35:25.) Brien reports that Austen "was very agitated and angry." (Brien Dep. 33:22-25.) However, she was eventually able to calm him down and persuade him to exit the house. (Brien Dep. 35:3-5; 35:18-20.) During this time, Brien did not personally observe evidence of Austen's intent to harm himself or others. (Brien Dep. 51:7-25; 52:1-7.)

Even taking this information into consideration, the court finds that it does not dispel the probable cause generated by the totality of the circumstances presented that

---

[6] Austen also points to evidence in the form of disposition codes, which were entered by the responding police units after they left the scene to clear the initiating radio call. (Pl.'s Opp. to City Def's' MSJ at 4.) However, the disposition codes are not authenticated and are of minimal probative value without additional foundation.

day.  This included the very serious threats that Austen had allegedly made to "take out" the police, and to kill Cruz and discover her whereabouts. In the absence of evidence that Cruz was not a reliable witness, Morales and Holguin were entitled to give weight to the LAPD reports when determining whether to take Austen into custody. *See Peng v. Hu*, 335 F.3d 970, 977-78 (9th Cir. 2003) ("The business of policemen and firemen is to act, not to speculate or meditate on whether the report . . . is correct."); *see also Gillan v. City of San Marino*, 147 Cal. App. 4th 1033, 1045 (Ct. App. 2007).

Finally, because Morales and Holguin acted with probable cause in taking Austen into custody, they were not required to detain him at a place of Austen's choosing or at a medical facility, as he contends, but could instead choose to conduct their interview at Devonshire Police Station.

### 2.  Initiation of Section 5150 Hold Process

Austen also challenges whether, under the totality of the circumstances, Holguin and Morales had probable cause to file an application for a Section 5150 hold after conducting their assessment at the police station.  The court has already determined that Holguin and Morales had probable cause to take Austen into custody. The question is whether this probable cause was subsequently dispelled by the information obtained through their assessment.

Austen begins by highlighting the fact that he expressly denied being suicidal or homicidal during his interview. (Holguin Dep. 32:21-33:18.) Yet an individual's denial of suicidal or homicidal intention does not by itself negate probable cause. Officer Morales had previously conducted approximately 175 Section 5150 evaluations, and observed that it was common for people to "become evasive with their answers" and "deny the suicidality of the situation." (Morales Dep. 10:1-3.) Holguin and Morales were not required to take Austen's denial at face value. *See Palter v. City of Garden Grove*, 237 Fed. App'x 170, 172 (9th Cir. 2007).

Instead, Morales and Holguin formulated their opinions after considering Cruz's report and observing Austen's behavior in custody. At the police station, Holguin

observed that Austen appeared "tense and agitated." (Holguin Dep. 32:21-33:18; 39:11-41:6.) Similarly, Morales noted that Austen began "shouting," "screaming profanities," "moving his arms around," and eventually refused to answer Holguin's assessment questions. (Morales Dep. 41:2-7, Dkt. 164-2.) Austen argues that his conduct was susceptible to a different interpretation, and reflected his anger at being detained. (Pl.'s Opp. to County Defs.' MSJ at 8.) In view of the gravity of the alleged threats, and because Austen's behavior might be consistent with either theory of his mental state, the court concludes that Austen's behavior while in custody did not serve to dispel probable cause for his continued evaluation.

Morales and Holguin were also entitled to rely upon information beyond their direct observations, including supplemental information from Cruz. Holguin called Cruz from the police station, and Cruz related the substance of her prior 911 calls. (Holguin ¶ 2.) Holguin found Cruz to be credible. (*Id.* ¶ 11.) Under these circumstances, Morales and Holguin had no need to "rule out" Cruz's allegations, as Austen asserts, and properly factored her information into their decision to file an application for a Section 5150 hold.[7]

Finally, Austen counters that Morales and Holguin subjectively knew that he was not dangerous because they removed his handcuffs once they transported him to Mission Community Hospital. Austen highlights the fact that Morales admitted he did not directly observe behavior indicating Austen was a threat. (Morales Dep. 74:1-25, 75:1-17.) Morales and Holguin also responded in the negative when the hospital charge nurse asked them whether Austen was dangerous. (Austen Dep. 69:16-23.) Austen additionally

---

[7] Nurse Olguin's Section 5150 hold application draws from additional observations of Austen's behavior. Specifically, Holguin wrote that Austen was "rambling about money and politics; wanted [social worker's] address; has mannequins displayed in house with clothes on; hording conditions [sic]; barricaded self in house; police got client out; evasive with answers." (Dkt. 149-7, Ex. C.) Because the court believes that the additional evidence of hoarding conditions and mannequins is not necessary to sustain the probable cause determination for dangerous mental illness, and because the court is skeptical of their probative value in this case, it does not rely upon these facts in its analysis of whether probable cause existed.

points to what he considers vindictive statements by Morales and Holguin. After asking Holguin whether a psychiatrist might release him early, he claims Holguin responded, "Not the way I'm writing this. You're going to be here for the full 72 hours." (Austen Dep. 69:5-6.) Similarly, Austen claims that Morales told him, "We would have charged you with something if we could have, but unfortunately there was nothing to charge you with." (Austen Dep. 68:12-69:6.)

While this evidence largely speaks to subjective intent or belief, the court is limited to objective facts in determining whether Morales and Holguin are entitled to qualified immunity. "[A] defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense." *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998); *see also Padilla v. Yoo*, 678 F.3d 748, 758 (9th Cir. 2012). Morales and Holguin are entitled to qualified immunity if, as the court determined earlier, the objective facts known at the time created probable cause for the Section 5150 hold.

The court additionally observes that Section 5150 "does not require proof of exigent circumstances." *Bias v. Moynihan*, 508 F.3d 1212, 1222 (9th Cir. 2007). When making the probable cause determination, an individual "shall not be limited to consideration of the danger of imminent harm." Cal. Welf. & Inst. Code § 5150(b). Instead, a person suspected of mental illness is subject to a 72-hour period for assessment and evaluation, which must occur "on an ongoing basis." *Id*. § 5150(a). This 72-hour period may accommodate the concern that a snapshot of a person's presentation is inadequate for a full diagnosis of the individual's mental state. *See People v. Barrett*, 54 Cal. 4th 1081, 1109 (2012) ("The LPS Act process itself assumes that the need for treatment may be temporary, and that disabling mental disorders may be intermittent or short-lived."). Symptoms of mental illness may "wax and wane" over time. *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). The removal of Austen's handcuffs, to the degree that it serves as evidence of his relatively stable presentation at the time, does not

overturn a determination that there was probable cause to detain him for further assessment and evaluation of mental illness.

Considered cumulatively, the objective facts known to Morales and Holguin were sufficient to establish probable cause to initiate a 5150 hold. An officer, or other authorized individual under Section 5150, assessing the totality of the circumstances, could have reasonably believed that Austen's detention was supported by probable cause, consistent with the Fourth Amendment. Therefore, the court concludes that Morales and Holguin are entitled to qualified immunity on this claim.

### iii. Mission Community Hospital

Austen additionally claims that MCH detained him without probable cause in violation of his Fourth Amendment rights. In general, claims of unlawful arrest without probable cause by state officials are pursued under the Fourth Amendment, and not the Fourteenth Amendment's substantive due-process claim. *See Albright v. Oliver*, 510 U.S. 266, 274 (1994). The Fourteenth Amendment's substantive due process standard is typically applied to cases of involuntary confinement or civil commitment by mental health facilities. *See, e.g., Jensen v. Lane Cty.*, 312 F.3d 1145, 1147 (9th 2002) (applying Fourteenth Amendment standard to temporary psychiatric hold). Specifically, the Fourteenth Amendment has been used to evaluate a doctor's exercise of medical judgment as to whether to retain a patient on a temporary psychiatric hold. *See id*. In *Jensen*, the parties conceded that probable cause existed in the initial arrest and referral for a mental health evaluation, leaving the Ninth Circuit to analyze whether the hospital's failure to order his early release constituted a due process violation under the Fourteenth Amendment. *Id*.

Here, the Section 5150 Application that MCH received indicated that Austen had, among other things, threatened to kill the police and a social worker for the Department of Mental Health. It also indicated that Austen had behaved evasively in custody, was rambling about politics and money, and had "barricaded himself" in his home when police arrived. (Dkt. 149-7, Ex. C.) The Assessment Report, which was completed as part

16

of the intake process, notes that Austen's mood was "Anxious, Irritable, Depressed," that his behavior was "Cooperative, Unpredictable," and that his thought processes were "Disorganized, Preoccupied, Obsessive." (Decl. Tala, Ex. 4.)  In view of these circumstances, the court concludes that the conditions under which Austen came to MCH's attention were adequate to establish probable cause, as required for a Section 5150 hold.

Whether, in the course of its examination and medical evaluation, MCH had cause to dispel these suspicious is a separate inquiry. After Austen was admitted to MCH for mental health treatment and evaluation, the court concludes that the Fourteenth Amendment due process standards apply to ensure that Austen was not only held with adequate justification, but that he was evaluated and assessed "on the basis of substantive and procedural criteria that are not substantially below the standards generally accepted in the medical community." *Id*. (quotations omitted).[8]

### b. Section 1983 Claims under the Fourteenth Amendment

The Fourteenth Amendment's due process clause provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. Amend. XIV § 1. These protections are embodied in the concepts of substantive and procedural due process. While procedural due process arises from "a denial of fundamental procedural fairness," substantive due process focuses on whether the state's deprivation of liberty is undertaken with "reasonable justification in the service of a legitimate governmental objective." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

In this case, Austen's Fourteenth Amendment claims against the County and LAPD Defendants are barred, as they are duplicative of the Fourth Amendment claims.

---

[8] The court countenances that there may be other circumstances in which a Fourth Amendment analysis is appropriately applied to the actions of medical personnel, but concludes that here, the specific contours of the Fourteenth Amendment analysis provide more guidance as to the propriety of medical conduct and decision-making.

*See Albright*, 510 U.S. at 274. This leaves MCH as the only viable defendant to a Fourteenth Amendment claim.

As a threshold matter, the court must determine whether MCH acted under color of state law. In *Monell v. Department of Social Services*, the Supreme Court held that municipalities and other local government units are liable under Section 1983 if "the constitutional violation was caused by a policy, practice, or custom of the entity." 436 U.S. at 691. *Monell* liability extends not only to municipalities but also to private entities, like MCH, who act under color of state law. *See Tsao v. Desert Palace, Inc*., 698 F.3d 1128, 1139 (9th Cir. 2012). Therefore, to support a finding of *Monell* liability, MCH must have acted under color of state law, and its policy or customs must have caused a violation of Austen's constitutional rights. [9] *See id.*

_____

[9] MCH appears to claim that it is not liable for Dr. Farrag's actions as he was an independent contractor. Whether or not Dr. Farrag is an independent contractor, however, is not essential to Austen's theory of *Monell* liability on the basis of the Hospital's lack of appropriate policies and procedures. *Monell* liability attaches to actions of a local government "whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694. Dr. Farrag acted under the auspices of MCH, serving as medical director of MCH's Behavioral Health Unit and as an admitting psychiatrist, and was subject to MCH's policies and practices. (Farrag Dep. 6:2-3; 7:9-11). Therefore, the court may fairly consider Dr. Farrag's actions in determining whether MCH's policies and practices caused a violation of Austen's constitutional rights.

As to Austen's state law claims, the court notes that the general rule in California is that an employer is not liable for the negligent acts or omissions of an independent contractor. *See Millsap v. Fed. Express Corp*., 227 Cal. App. 3d 425, 430 (Ct. App. 1991). This rule is subject to numerous exclusions. Specifically, "[o]ne who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions." *J.L. v. Children's Inst., In*c., 177 Cal. App. 4th 388, 400 (Ct. App. 2009) (quotations omitted). In view of the regulatory safeguards imposed on MCH by the LPS Act, *see* Cal. Welf. & Inst. Code §§ 5150 *et seq.*, the court concludes that MCH may also be liable under state law for Dr. Farrag's conduct.

There are four tests for determining whether a private actor like MCH acts under color of law: (1) the public function test; (2) the joint action test; (3) the government nexus test; and (4) the government coercion or compulsion test. *Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002). The court finds that the joint action and government nexus tests are the most apposite here. Under the joint action test, the state must have "so far insinuated itself into a position of interdependence with the private actor that it must be recognized as a joint participant in the challenged activity." *Id.* (quotations and alterations omitted). Similarly, the government nexus test requires that "there is a such a close nexus between the State and the challenged action that the seemingly private behavior may be fairly treated as that of the State itself." *Kirtley v. Rainey*, 326 F.3d 1088, 1095 (9th Cir. 2003).

In view of the reliance of the Section 5150 hold system on the cooperation of private medical facilities, such as MCH, for the admission, assessment, and evaluation of psychiatric hold patients, the court concludes that MCH acted "under color of state law" when it elected to admit Austen on a Section 5150 hold. *See Jensen*, 222 F.3d at 575 (finding state action when "the County through its employees [had] undertaken a complex and deeply intertwined process of evaluating and detaining individuals who are believed to be mentally ill and a danger to themselves or others"). Here, like the private contract doctor in *Jensen*, MCH "signed the order detaining [Austen] for evaluation" in near-exclusive reliance upon police reports and information obtained from state officials. *Id.* at 573. The extent of this cooperation exceeds that described in *Julian v. Mission Community Hospital*, a state decision concluding that MCH was not a state actor when Julian "alleged only that the county designated the hospital as a facility that may hold individuals under section 5150 and that [the doctor] treated her with the hospital's authorization." 11 Cal. App. 5th 360, 398 (Ct. App. 2017), *as modified on denial of reh'g* (May 23, 2017).

Having concluded that MCH is a state actor for the purposes of Section 1983, the court next examines whether MCH's policies violated Austen's substantive and procedural due process rights.

### i. Substantive Due Process

Austen argues that he was mistakenly detained on a 72-hour psychiatric hold in violation of his substantive due process rights under the Fourteenth Amendment. Examining the totality of the circumstances, the court concludes that there are triable issues of fact underlying whether MCH had a basis to continue to detain Austen under Section 5150.

In the case of a Section 5150 hold, MCH must have reason to believe that Austen "as a result of a mental health disorder, [was] a danger to others, or to himself or herself, or gravely disabled." Cal. Welf. & Inst. Code § 5150(a). By its nature, this determination calls for an evaluation of the patient's mental health. In rendering this evaluation, a doctor must exercise his or her judgment in accordance with commonly accepted medical standards. "Though committing physicians are not expected to be omniscient, the statute implicitly requires that their judgment . . . be exercised on the basis of *substantive and procedural criteria that are not substantially below the standards generally accepted in the medical community.* Due process requires no less." *Jensen*, 312 F.3d at 1147.

Austen claims that Dr. Farrag, in the course of his examinations, should have known that he was not mentally ill and released him early from the 72-hour hold. The question here is whether Dr. Farrag elected to detain Austen after mental health suspicions based on Austen's reported past conduct were reasonably dispelled.[10]

Dr. Farrag evaluated Austen the day after admission, and observed that Austen was providing him with "a totally different picture" than in the Section 5150 Application. (*Id*.) He noted that "right now, I have two totally different stories . . .[s]o I will observe for

---

[10] MCH proffers evidence by expert witness David Braff, a board certified psychiatrist licensed in California, who opined that "the nurses and staff of MCH complied at all times with the standard of care in the community." (Braff Decl. ¶ 1, Dkt. 148-2.) This declaration is of minimal value, as Braff's declaration refers only to the actions of individuals other than Dr. Farrag. (*See id*. ¶ 19 ("Only Dr. Farrag as the attending psychiatrist could make the determination regarding whether Mr. Austen was to remain on the 5150 hold. . . None of the nurses or staff of MCH could have taken Mr. Austen off this 5150 hold while he was at MCH."))

myself." (*Id.*) Dr. Farrag asked a hospital social worker to contact Austen's alleged daughter to collect "more collateral information" and re-evaluated Austen the following day (*Id.*) That day, Dr. Farrag was presented with information that Austen, then 54 years-old, was living with an individual who he claimed to his adopted daughter, but who was in fact a 22-year-old woman he had met on the internet. (*Id.*, Exs. 6, 7.) Dr. Farrag notes that Austen had "told [the alleged daughter] to tell us good information; otherwise, people will get harmed." (*Id.*, Ex. 7.)

In view of this information, Dr. Farrag was puzzled as to "why [Austen] was lying to [him] about the whole story," and decided that further "investigation" of the situation was warranted. (Tala Decl., Ex. 7.) Dr. Farrag's case notes indicate the following:

> "For now, I told the social worker to tell [the LAPD's Mental Evaluation Unit, Case Assessment Management Program (CAMP)] that the patient's hold is up tomorrow and from his representation, psychiatrically speaking, he is not a danger to self, not a danger to other[s], and is not gravely disabled. I am not so sure that I will have any criteria to hold him against his will. I am not sure even that he need psychiatric treatment. More than anything else, I do not know simply what is happening outside to him or with other people. . . There are a lot of questions in my mind, but as a psychiatrist, I do not have [many] answers for it." (*Id.*)

Although Dr. Farrag continued to evaluate Austen, he did not release Austen prior to the expiration of the 72-hour hold. Dr. Farrag's discharge notes indicate that "[f]rom admission, actually the representation of the patient was quite intact. At that point, I did not give him any routine psychiatric medicine[,] giving myself the period of 72-hour hold for evaluation and [to] collect more information." (Tala Decl., Ex. 9.)

Assuming *arguendo* that Austen's detention was unlawfully prolonged, a reasonable trier of fact could determine that the violation arose from MCH's policies and practices. According to Austen, none of the hospital personnel he encountered were certified under the Lanterman-Petris-Short ("LPS") Act to determine whether he should be detained on a 5150 hold. (Ruiz Dep. 21:3-22:9; 18:5-21:1.) The County of Los Angeles conducts LPS training and certification courses for individuals to conduct assessments

and file 5150 hold applications. (Lennon Decl. ¶ 5.) Had Dr. Farrag and hospital staff been trained in the procedural safeguards and substantive standards under the LPS Act, then the duration of Austen's detention might have been curtailed. In addition, Austen was examined by Dr. Farrag after nearly one-third of his 72-hour psychiatric hold had elapsed. Had Austen been evaluated earlier by Dr. Farrag or another qualified psychiatrist after admission, this additional information could have generated grounds for his early release. *See* Cal. Welf. & Inst. Code § 5152 ("Each person admitted to a facility for 72-hour treatment and evaluation. . . shall receive an evaluation *as soon as possible* after he or she is admitted. . . .") (emphasis added).

Accordingly, the court concludes that there are triable issues of fact as to whether Dr. Farrag's exercise of medical judgment in detaining Austen complied with the prevailing standards of care for a temporary psychiatric hold, and whether Austen's release from detention was unlawfully delayed as a result of MCH's policies and practices.

**ii. Procedural Due Process**

Austen alludes to due process violations arising from Defendants' failure to comply with the procedural requirements of Section 5150.[11] While unclear from the Fourth Amended Complaint, the court infers that these procedural violations essentially stem from MCH's failure to have a medical professional, such as Dr. Farrag, assess Austen prior to admission on a 72-hour psychiatric hold. Instead, Austen's admission to MCH's Behavioral Health Unit began when he was seen by intake nurse Carlos Megia. (Megia Decl. ¶ 3.) Austen claims that his pre-admission examination by Nurse Megia was

---

[11] The entirety of this claim is set forth in the following sentence: "Defendants also violated Plaintiff's rights under the Fourteenth Amendment to substantive and procedural due process by detaining him allegedly based upon Welfare & Institutions Code § 5150 without complying with that section's mandatory procedural requirements and without adequate justification to conclude the Austen was a danger to himself or others or gravely disabled." (Fourth Am. Compl. ¶ 131.)

largely ministerial, and that Dr. Farrag conducted a psychiatric evaluation the following day.

The court notes that there is little authority on the kinds of constitutionally required procedural safeguards accorded to those detained on a temporary Section 5150 hold. Several courts have affirmed that "[t]he initial 72 hours of detention is justified as an emergency commitment. It is recognized that a probable cause hearing cannot be arranged immediately." *Doe v. Gallinot*, 486 F. Supp. 983, 993 (C.D. Cal. 1979), *aff'd*, 657 F.2d 1017 (9th Cir. 1981). At the same time, even in the temporary hold context, "the decision to order an involuntary emergency commitment [must] be made in accordance with a standard that promises some reasonable degree of accuracy." *Jensen*, 312 F.3d at 1147 (quotations omitted).

Here, the evidence may reveal that Austen waited for almost 24 hours in hospital custody before a medical professional could render a psychiatric opinion on whether he suffered from a dangerous mental illness or could otherwise assess the propriety of his detention. The issue presented is whether, for a short-term emergency hold, more process was due.

The court can envision circumstances when a psychiatrist is not immediately available, and hospital must delegate the pre-admission assessment to a qualified professional acting at the direction of a doctor until a psychiatric evaluation can be made. *See Heater v. Southwood Psychiatric Ctr.*, 42 Cal. App. 4th 1068, 1080 (Ct. App. 1996) ("If the homicidal or suicidal must go free unless an 'authorized person' is always immediately available, the LPS Act is futile."); *see also* Cal. & Welf. Code § 5151 (specifying that "the professional person in charge of the facility or his or her designee" shall conduct the pre-admission assessment). However, the court cannot conclude that this excuses the lack of any pre-admission assessment by a qualified medical staff member as to whether the Section 5150 hold criteria are satisfied.

As a procedural safeguard, Section 5151 mandates that an "assessment" of Austen occur prior to admission.[12] Section 5151 provides that "[p]rior to admitting a person to the facility for treatment and evaluation pursuant to Section 5150, the professional person in charge of the facility or his or her designee shall assess the individual in person to determine the appropriateness of the involuntary detention." Cal. & Welf. Code § 5151. Section 5150(c) adds that the "professional person in charge of a facility designated by the county for evaluation and treatment, member of the attending staff, or professional person designated by the county shall assess the person to determine whether he or she can be properly served without being detained." Cal. Welf. & Inst. Code § 5150(c) (emphasis added). The question before the court, therefore, is whether an appropriate pre-admission assessment was conducted in accordance with these provisions.

As defined in Section 5150.4, an "assessment" is "the determination of whether a person shall be evaluated and treated pursuant to Section 5150." Thus, the pre-admission assessment, together with the other assessments conducted during the course of the 72-hour hold, must fulfill the purpose of determining whether the Section 5150 psychiatric hold is appropriate and whether the individual can be adequately served without being detained.

The court further notes that an "assessment" is distinct from an "evaluation," though the concepts are not unrelated. Under Section 5008(a), an "evaluation" consists of "multidisciplinary professional analyses of a person's medical, psychological, educational, social, financial, and legal conditions as may appear to constitute a problem." Section 5152 notes that this evaluation must be performed "as soon as

---

[12] In following this line of analysis, the court does not suggest that the Fourteenth Amendment standard is necessarily identical to that under Section 5150. For the purposes of this motion, however, the parties appear to agree that a failure to perform the pre-admission assessment mandated in Section 5150 would constitute a violation of Austen's constitutional rights. (*See, e.g.*, MCH MSJ at 13 ("To successfully prove a *Monell* claim against MCH, Plaintiff must show that, contrary to Welfare & Inst. Code § 5151, he did not receive an in person assessment . . . .").)

possible" after admission. Therefore, the pre-admission assessment serves a different purpose than the medical evaluation. That purpose, the court finds, is to ensure that the requirements of a 5150 hold are met with respect to probable cause. In other words, the "assessment" entails determining whether there is probable cause that the individual "as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled." *Id.* § 5150(a).

As part of that assessment, the assessor must have the capacity to deny admission for more than purely administrative reasons. Here, the court finds the case of *Heater v. Southwood Psychiatric Center* to be instructive. 42 Cal. App. at 1080. In *Heater*, the state court asked whether an individual was "assessed in person by the professional person in charge" or by a designee under Section 5151. *Id*. at 1081. The court concluded that the individual had been assessed by a nurse, "acting at the direction of a medical doctor" who determined that the detention was appropriate under Section 5150. *Id*. at 1080. The court observed that "[h]ad [the nurse's] assessment been that [the patient] was *not* a danger to himself or others she would have so reported." *Id*. at 1081. Thus, the person conducting the pre-admission assessment must have the discretion to deny admission, or be empowered to recommend this course of action to someone with such authority.

At oral argument, counsel for MCH asserted that Nurse Mejia's job was not to serve as a "gatekeeper" to determine whether Austen was properly admitted under Section 5150. (Tr. 46:24-47:6.) Counsel conceded that Mejia had no discretion as to whether or not to admit Austen, barring problems with paperwork such as "whether the 5150 application is properly filled out, whether the date and time are indicated, whether there is a signature, and whether the criteria are checked." (Tr. 61:4-12; MSJ at 14 (citing Tala Decl., Ex. 18, Ruiz Dep. 34:22-35:3).) Instead, counsel asserted that "the assessment by the intake nurse is to make sure the application is appropriate, that the patient is being evaluated or assessed in terms of, 'Do you have any psychosis right now? Do you have any delusions at this moment,' and that paperwork or [a] progress note generated at that time aids the psychiatrist who performs the ultimate evaluation in determining whether

or not the patient is still and remains a danger to self and to others." (Tr. 61:4-12.)  In other words, the intake nurse's official function was limited to checking the Section 5150 paperwork and performing an intake survey for eventual consideration by the psychiatrist.

Here, the court cannot agree that the initial pre-admission assessment serves little more than a "paperwork function" or routine intake screening. Rather, the statutory scheme contemplates a determination by the "professional in charge," or a designee, that a Section 5150 hold is appropriate in light of the statutory criteria for probable cause and the circumstances known at the time. This is not to say that MCH cannot consider reliable information provided on a 5150 Application in making this assessment. But MCH cannot be limited to rubberstamping a Section 5150 Application on the erroneous basis that the "hold is already in place," (MCH MSJ at 8; Farrag Dep. 56:16-21), such that an individual is nearly always admitted.

This conclusion is supported by the fact that the Section 5150 Application is not a direct admission form. It serves as an "Application for Assessment, Evaluation, and Intervention or Placement for Evaluation and Treatment." (Dkt. 149-7, Ex. C).[13] For this reason, the 72-hour period typically begins upon an individual's admission to the medical facility. *See* Cal. Welf. & Inst. Code § 5151 ("If the facility designated by the county for evaluation and treatment admits the person, it may detain him or her for evaluation and treatment for a period not to exceed 72 hours.").

In light of this statutory scheme, the court concludes that MCH had a gatekeeping function to determine whether Austen could be properly admitted for a 72-hour psychiatric hold. Furthermore, in view of the evidence set forth, the court finds there is a triable issue of fact as to whether MCH conducted a pre-admission assessment of

---

[13] Section 5150(e) states that if it is determined that "the person cannot be properly served without being detained," the admitting facility must require "an application in writing stating the circumstances," including the basis for the probable cause determination.

whether the Section 5150 hold criteria were met. Thus, the court denies summary

judgment on Austen's procedural due process claim.[14]

## B. State Immunities

With respect to Austen's state law causes of action, Defendants claim immunities

under California Welfare & Institutions Code § 5278. This section provides that

"[i]ndividuals authorized under [Section 5150] to detain a person for 72-hour treatment

and evaluation . . . shall not be held criminally or civilly liable for exercising this

authority in accordance with the law." Cal. Welf. & Inst. Code § 5278; *see also* Cal. Gov't

Code § 856. This immunity extends to "the institutions and agencies" where those

individuals work. *Cruze v. Nat'l Psychiatric Servs.*, Inc., 105 Cal.App.4th 48, 56 (2003).

However, Section 5278 does not extinguish all remaining state liabilities. Because

the court earlier concluded that Cruz and MCH may not have acted in accordance with

law, they are not necessarily immune from liability under Section 5278 for their

involvement in Austen's detention. The court also examines whether Defendants are

liable for the false light claims and the Section 5150.05(c) claims, which may not be

covered by the scope of Section 5278's grant of state immunity.

### a. California Government Code § 815.6

Unless expressly noted, there is generally no private right of action for violations

of Section 5150. *Julian*, 11 Cal. App. 5th at 381. Instead, Austen seeks to enforce the

substance of those provisions through Government Code § 815.6. This statute provides

that "[w]here a public entity is under a mandatory duty imposed by an enactment that is

designed to protect against the risk of a particular kind of injury, the public entity is

liable for an injury of that kind proximately caused by its failure to discharge the duty

_____

[14] In doing so, the court notes that the measure of damages available to Austen for this
particular procedural violation may be minimal. The court earlier concluded that
probable cause existed to support the initial admission decision, and so damages flowing
from an erroneous admission pursuant to deficient procedures would be nominal, or
limited to emotional distress damages caused by the fact of the procedural violation
itself. *See Carey v. Piphus*, 435 U.S. 247, 260–61 (1978).

unless the public entity establishes that it exercised reasonable diligence to discharge the duty." Cal. Gov't Code § 815.6.

Austen contends Defendants violated certain mandatory duties encoded in Section 5150. Specifically, Austen alleges that (1) "the officers did not follow the procedure laid out in § 5150.05 in determining whether probable cause existed"; (2) "Mission Community Hospital failed to have a psychiatrist interview Austen prior to admitting him" pursuant to § 5150(a); and (3) Defendants "did not follow the provisions of § 5150(a), which mandates at a minimum ongoing assessment of whether Austen should be taken into custody."[15] (*See* FAC.)

The first claim is subject to the immunities of Section 5278, as it relates to the lawful exercise of LAPD Defendants' Section 5150 detention authority, and reflects arguments that have been earlier rejected by the court. The second claim is unsupported by the text of Section 5150(a), which merely requires that the professional person in charge of the facility or "his designee" conduct the assessment, and not a psychiatrist. Moreover, the third and second claims fail because they are brought against MCH, a private entity. Government Code § 815.6 extends liability only to public entities, which are defined as "the state, the Regents of the University of California, the Trustees of the California State University and the California State University, a county, city, district, public authority, public agency, and any other political subdivision or public corporation in the State." Cal. Gov't Code § 811.2. Accordingly, the court grants summary judgment to Defendants on this claim.

### b. False Arrest and Imprisonment

---

[15] The court notes that, in his opposition briefs, Austen cites (for the first time) violations of California Welfare & Institutions Code §§ 5150(g)(1),(2) as giving rise to the § 815.6 claim, despite the fact that these code sections are nowhere mentioned under this cause of action in his Fourth Amended Complaint. Even assuming that §§ 5150(g)(1),(2) impose mandatory duties, Austen has not proffered evidence that he has been harmed by Defendants' alleged failure to discharge these duties. Therefore, this claim fails.

Defendants also move for summary judgment on Austen's false arrest and false imprisonment claims. In California, false imprisonment is "the unlawful violation of the personal liberty of another." *Asgari v. City of Los Angeles,* 15 Cal.4th 744, 757 (1997). False imprisonment requires "the nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short." *George v. City of Long Beach,* 973 F.2d 706, 710 (9th Cir. 1992) (quotations omitted). False arrest is not a separate tort, but merely one manner of committing a false imprisonment. *Collins v. City & Cty. of San Francisco,* 50 Cal.App.3d 671, 673 (Ct. App. 1975). The court concluded earlier that Holguin, the County, and the LAPD Defendants are immune under Section 5278 for these claims because they arise from facts inherent in Austen's detention under Section 5150.

However, the court also concluded that MCH may be liable for unlawfully detaining Austen in violation of the Fourth and Fourteenth Amendments. Additionally, the court finds that there is a triable issue of fact as to whether Cruz misrepresented the nature of her calls with Austen, thereby leading to the welfare check and his subsequent detention. As a result, the court denies summary judgment on this claim as to Cruz and MCH, but enters it with respect to the remaining Defendants.[16]

### c. Negligent Infliction of Emotional Distress

"Under traditional tort law principles, a person is . . . under no duty to protect another person from harm. An affirmative duty to protect another from harm may arise, however, where a 'special relationship' exists. Such a special relationship is typically where the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare." *Kockelman v. Segal*, 61 Cal. App. 4th 491, 498-99 (Ct. App. 1998) (citations omitted). For example, a special

---

[16] The court does not impose vicarious liability for false imprisonment on the County, Cruz's employer, as it finds that Cruz did not act "within the course and scope of [her] employment" at the Children's Bureau of the Department of Mental Health when she placed the 911 calls. *Scannell v. County of Riverside*, 152 Cal. App. 3d 596, 605 (Ct. App. 1984).

relationship governs the actions of "common carriers toward their passengers, those of innkeepers to their guests, shopkeepers to their business invitees." *Koepke v. Loo*, 18 Cal. App. 4th 1444, 1452 (Ct. App. 1993). The court finds no authority, and Plaintiff has proffered none, establishing a special relationship between Cruz and Austen, such that a duty of care attaches.

On the other hand, courts have found the existence of a special relationship between patients and doctors in certain situations, including in the malpractice context. *See Burgess v. Superior Court*, 2 Cal. 4th 1064, 1075 (1992). Under a Section 5150 hold, Austen was subject to ongoing medical evaluation, assessment, and treatment by the admitting facility. *See* Cal. Welf. & Inst. Code § 5150(a). On this basis, the court finds that a special relationship exists to sustain the imposition of a duty of care, and that a reasonable trier of fact could find that MCH's actions toward Austen breached this duty. The court thus denies Defendant MCH summary judgment on this claim.

### d. Intentional Infliction of Emotional Distress

In California, a plaintiff prevailing on a claim of intentional infliction of emotional distress must establish: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Hughes v. Pair*, 46 Cal.4th 1035, 1050 (2009) (quotations omitted).

The court concludes that there is a triable issue of fact as to whether Cruz's statements to the 911 operator about Austen's threats of suicide and violence were false and made with "reckless disregard of the probability of causing[] emotional distress." *Id*. Similarly, the court finds that Defendant MCH's actions or omissions with respect to Austen's detention may have been performed with reckless disregard. Therefore, the court denies summary judgment on this claim as to Cruz and MCH, but grants summary judgment on this claim with respect to the remaining Defendants.

### e. False Light

Austen brings false light claims against the County Defendants and Mission County Hospital. These claims arise when the plaintiff is placed "before the public in a false light that would be highly offensive to a reasonable person, and where the defendant knew or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed." *Price v. Operating Eng'rs Local Union No. 3*, 195 Cal. App. 4th 962, 970 (Ct. App. 2011).

Austen argues that Holguin falsely published the 5150 Application. Yet Austen adduces no evidence that the 5150 Application was ever published. Publication occurs when there exists "disclosure to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Rest. 2d Torts § 662(d). Here, the 5150 Application was distributed to Austen and hospital staff. The court is not aware of, nor has Plaintiff brought to the court's attention, any situation in which the issuance of a 5150 Application constitutes publication. For similar reasons, MCH's creation of a medical record, which includes the 5150 Application, does not constitute a publication. Nor does the issuance of a document entitled "Patient Notification of Firearms Prohibition and Right to Hearing" upon Austen's release. (Tala Decl., Ex. 8.) This document was marked "confidential," and indicates that its distribution is limited to "(1) Facility and (2) Patient." (*Id*.) Austen's assertion that the document constitutes a publication "to the public at large" is devoid of evidentiary support. *Id.* Thus, the court grants summary judgment to Defendants on the false light claim.

### f. California Welfare & Institutions Code § 5150.05(c)

Finally, Austen brings a claim under § 5150.05(c) against the County of Los Angeles and Jessica Cruz. This provision creates a private cause of action when "the probable cause [for a Section 5150 hold] is based on the statement of a person" who "intentionally give[s] any statement that he or she knows to be false." Cal. Welf. & Inst. Code § 5150.05(c). Consistent with its conclusions above, the court finds that there is a triable issue of fact as to whether Cruz's 911 statements concerning Austen's threats of

suicide and violence were intentionally false. However, Austen adduces no evidence to suggest that this provision should be read broadly to create liability on the part of Cruz's employer the County of Los Angeles. Therefore, the court grants summary judgment on this claim to the County of Los Angeles, but denies summary judgment as to Cruz.

## IV. CONCLUSION

For the reasons stated above, the LAPD Defendants' Motion for Summary Judgment is GRANTED; Mission Community Hospital's Motion for Summary Judgment is GRANTED in part and DENIED in part; and the County Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part.

**IT IS SO ORDERED.**

Dated: January 19, 2018

_____

DEAN D. PREGERSON
UNITED STATES DISTRICT JUDGE